UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

FROEDTERT HEALTH, INC.; FROEDTERT           )
MEMORIAL LUTHERAN HOSPITAL, INC.;           )
FROEDTERT MENOMONEE FALLS                   )
HOSPITAL, INC.; ST. JOSEPH'S COMMUNITY      )
HOSPITAL OF WEST BEND, INC.; THE            )
MEDICAL COLLEGE OF WISCONSIN                )
COMMUNITY PHYSICIANS, INC.;                 )
                                            )
    Plaintiffs,                             )
                                            )
v.                                          )   Case No.
                                            )
IRONSHORE SPECIALTY INSURANCE               )
COMPANY, INC.,                              )
                                            )
    Defendant.                              **)**

## COMPLAINT

Plaintiff Froedtert Health, Inc. and its associated entities Froedtert Memorial Lutheran Hospital ("Froedtert Hospital"), Froedtert Menomonee Falls Hospital ("Menomonee Falls Hospital"), St. Joseph's Community Hospital of West Bend ("West Bend Hospital"), and The Medical College of Wisconsin Community Physicians, Inc. ("MCWCP") (collectively, "Froedtert"), by and through their attorneys, brings this action against Ironshore Specialty Insurance Company, Inc. ("Ironshore"), and in support alleges as follows:

## NATURE OF THE ACTION

1. This is an insurance coverage dispute between Froedtert and its pollution insurance carrier, Ironshore.

2. Froedtert has been at the front lines of the battle against COVID-19. Froedtert Memorial Lutheran Hospital is the only Level I trauma center in southeastern Wisconsin, and it is one of only two Level I trauma centers in the entire state of Wisconsin. Froedtert spent over

$18,000,000 on labor and materials to respond to the presence of SARS-CoV-2 on its properties. These expenses were reasonable and necessary in order to allow Froedtert's medical professionals to provide life-saving care for thousands of critically-ill patients.

3. Ironshore issued a Site Pollution Incident Legal Liability Select ("SPILLS") insurance policy ("Ironshore Policy"). A copy of the Ironshore Policy is attached at **Exhibit A**. The Ironshore Policy provides coverage for "Disinfection Event Expenses" per "each incident" and up to $10,000,000 in the aggregate. (**Ex. A**, pp. 2-3, 37).

4. The SARS-CoV-2 and COVID-19 outbreak within Froedtert's properties falls squarely within the Ironshore Policy's definition of "Disinfection Event."

5. The money Froedtert spent on labor and materials in response to the pandemic falls squarely within the Ironshore Policy's definition of "Disinfection Event Expenses."

6. Under the terms of the Ironshore Policy, Ironshore has a duty to indemnify Froedtert for the amounts it spent on "Disinfection Event Expenses," but Ironshore has refused to do so.

7. Because Ironshore wrongfully refused to indemnify Froedtert for its "Disinfection Event Expenses," Froedtert alone has born the loss.

8. This action is for declaratory relief and breach of contract arising out of Ironshore's wrongful refusal to indemnify Froedtert.

**PARTIES**

9. Plaintiff Froedtert Health, Inc. is the parent entity of a healthcare network headquartered in Milwaukee, Wisconsin. Froedtert Health is incorporated in Wisconsin as a nonstock corporation. Froedtert Health operates and/or has ownership interest in a network of hospitals and medical facilities in Wisconsin.

10. Plaintiff Froedtert Memorial Lutheran Hospital, Inc. is an obligated group member of Froedtert Health, which is incorporated in Wisconsin as a nonstock corporation and has its principal place of business in Milwaukee, Wisconsin.

11. Plaintiff Froedtert Menomonee Falls Hospital, Inc. is an obligated group member of Froedtert Health. It is incorporated in Wisconsin as a nonstock corporation and has its principal place of business in West Bend, Wisconsin.

12. Plaintiff St. Joseph's Community Hospital of West Bend, Inc. is an obligated group member of Froedtert Health. It is incorporated in Wisconsin as a nonstock corporation and has its principal place of business in West Bend, Wisconsin.

13. Plaintiff The Medical College of Wisconsin Community Physicians, Inc. is a nonstock corporation incorporated in Wisconsin and has its principal place of business in Milwaukee, Wisconsin. It is partially owned by Froedert Health.

14. As such, Froedtert is a citizen of the State of Wisconsin.

15. Defendant Ironshore Specialty Insurance Company is an Arizona corporation with its principal place of business in Massachusetts. As such, Ironshore is a citizen of the States of Arizona and Massachusetts.

**JURISDICTION AND VENUE**

16. This court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship among the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

17. In the Ironshore Policy, the parties designated the state and federal courts located in New York, New York as the forum for their disputes. (**Ex. A**, p. 9, § VII, ¶ H). Therefore, no other district may serve as the venue for this dispute and 28 U.S.C. § 1391(b)(3) applies.

18. Venue is proper in this court under 28 U.S.C. § 1391(b)(3). Ironshore does business in the State of New York and has its claims headquarters at 28 Liberty Street, 5th Floor, New York, New York 10005. Because Ironshore does business in the State of New York, it is subject to jurisdiction in the courts of the State of New York and the federal court situated in the Southern District of New York. CPLR § 302(a)(1).

## BACKGROUND

**The Ironshore Policy**

19. On September 5, 2019, Ironshore issued to Froedert a Site Pollution Incident Legal Liability Select ("SPILLS") insurance policy bearing policy number 004098600. (See **Ex. A**). Ironshore charged a premium of $71,350.00, which Froedtert promptly paid. The Ironshore Policy covered Froedert for a three-year policy period from July 1, 2019 through July 1, 2022.

20. The Ironshore Policy is a special type of insurance policy designed to protect an insured against certain environmental risks. The policy Froedtert purchased contained a "Healthcare Form" and specifically contemplated the types of risks a healthcare provider might face, including damage from infectious viruses. (See **Ex. A**, p. 48, § IX, ¶ G). The Ironshore Policy contains six types coverages: Third Party Claims for Bodily Injury, Property Damage and Remediation Expenses, First Party Remediation Expenses, Emergency Response Expenses, Business Interruption, Disinfection Event Expenses, and Evacuation Expenses.

21. The Disinfection Event Expenses coverage part has a $10,000,000 "Each Incident" limit of liability, inclusive of legal fees and expenses. The Ironshore Policy provides coverage for up to $10,000,000 in covered expenses in the aggregate.

22. The Policy states that Ironshore will pay for Disinfection Expenses arising from a Disinfection Event provided that the Disinfection Event is discovered by Froedtert and reported to Ironshore within the policy period. The Ironshore Policy provides:

> **E.  Disinfection Event Expenses**
>
> To pay on behalf of the **Insured**, **Disinfection Expenses** arising from a **Disinfection Event**, provided that:
>
> 1. The **Disinfection Event** is first discovered by the **Insured** during the **Policy Period**. Discovery of a **Disinfection Event** happens when a **Responsible Insured** first becomes aware of the **Disinfection Event**; and
>
> 2. The **Insured** reports the Disinfection Event **to the Company**, in writing, in accordance with Section IV., Paragraph CB.

(**Ex. A**, p. 37, § I, ¶ E).

23. "Disinfection Expenses" is defined as:

> **Disinfection Expenses** means reasonable fees and costs incurred by the Insured to clean and disinfect a **Covered Property** after any **Disinfection Event**, provided that such fees and costs are incurred within thirty (30) days of discovery of the **Disinfection Event**. Discovery of **Disinfection Event** occurs when a **Responsible Insured** first becomes aware of the **Disinfection Event**.

(**Ex. A**, p. 48, § IX, ¶ H).

24. "Disinfection Event" is defined as:

> **Disinfection Event** means any case or series of cases of the MRSA virus or other facility-borne infectious virus, bacteria or disease that requires reporting of such case or series of cases to any local, state or federal governmental or healthcare oversight agency or entity. **Disinfection Event** [sic] do not include **Pollution Incidents**.

(**Ex. A**, p. 48, § IX, ¶ G).

25. The Ironshore Policy contains a deductible provision:

**VI.   LIMITS OF LIABILITY AND DEDUCTIBLE**

>> Without regard to the number of **Insureds, Covered Properties, Pollution Incidents, Claims** or claimants, the following limits of liability apply:
>
> . . .
>
> **D.   DEDUCTIBLE**
>
> > Subject to Paragraphs **A.**, **B.**, and **C.** above, the Company will pay for all **Loss** in excess of the applicable deductible amount set forth in the Item 5. of the Declarations. The deductible is the obligation of the **Named Insured** and applies to all **Loss** arising out of the same, related or continuous **Pollution Incident(s)**.

(**Ex. A**, p. 42, § VI; § VI, ¶ D).

26. The Ironshore Policy contains the following professional services exclusion:

> **J.   INSURED'S PROFESSIONAL SERVICES**
>
> Any professional services performed or rendered by the **Insured**.

(**Ex. A**, p. 39, § III, ¶ K). The term "professional services" is not defined in the Ironshore Policy.

27. The Ironshore Policy contains the following Internal Expenses Exclusion:

> **H.   INSURED'S INTERNAL EXPENSES**
>
> Any costs, charges, or expenses incurred by the **Insured** for goods supplies or services performed by the staff or salaried employees of the **Insured**, or its parent, subsidiary or affiliate, unless such costs, charges or expenses are incurred with the prior written approval of the Company, which it may grant or withhold in its sole discretion.

(**Ex. A**, p. 39, § III, ¶ H). However, the Policy excuses the requirement of prior written approval where "notice is not possible under the circumstances because actions or measures … are immediately required to respond to a Disinfection Event due to an imminent threat to human health or the environment." (**Ex. A**, p. 41, § V. ¶ B).

**SARS-CoV-2 and the COVID-19 Pandemic**

28. On November 17, 2019, a 55-year-old from Hubei province, China became ill from exposure to a previously unknown virus that strongly resembled the SARS-CoV virus, which

broke out in China in 2003 and wreaked havoc across the globe. Similar cases began to be reported in China at that time at a rate of 1 to 5 each day, with 9 reported in November and 27 reported by December 15. Then, cases began to rise by double-digits, with 60 reported by December 20, and 180 by December 27. By December 31, there were 266 confirmed cases, and, one day later, on January 1, 2020, the number rose to 381.

29. On March 11, 2020, the World Health Organization ("WHO") declared a pandemic.

30. On March 12, 2020, Wisconsin Governor Tony Evers issued Executive Order 72, declaring a public health emergency.

31. On March 13, 2020, President Trump declared a National Emergency. At that time, there were over 1,700 confirmed cases and 40 confirmed deaths in the U.S.

32. On March 25, 2020, Governor Evers issued Emergency Order #12, known as the "Safer at Home" Order, directing people not to leave their homes unless necessary. The Order notes that within the last 72 hours, "COVID-19 cases have risen in the United States from 15,219 to 33, 404 (119% increase) and have risen in Wisconsin from 206 to 416 (102% increase)." The exponential growth rate of COVID-19 cases meant that "the number of people needing medical care due to COVID-19 will significantly exceed the amount of available healthcare resources."

33. At this point, it was far too late in the U.S. to contain SARS-CoV-2 by testing, contact tracing, and isolating – as was successfully done in South Korea and elsewhere. The virus had been spreading in the U.S. for at least a month and had reached "community spread" – a point where the origin of infections could no longer be identified, and it was no longer possible to contain the virus except by enforcing social distancing by shutting down the U.S. economy and ordering citizens to stay home except for essential activities.

34.     On May 13, 2020, the Wisconsin Supreme Court blocked the "Safer at Home" Order and reopened the state. With no protocols in place, Wisconsin became a "hot spot" with thousands of confirmed cases being reported each day.

**Froedtert's Response to SARS-CoV-2 and the COVID-19 Pandemic**

35.     Governor Evers has acknowledged the strain placed on Wisconsin's healthcare system in particular. In January 2021, he issued Emergency Order #1, which declared that the Wisconsin "hospital system is on the brink of an unsustainable strain," with more than a third of hospitals operating at peak capacity. As a result, many healthcare providers – like Froedtert – have been forced to reallocate their resources. Statewide, according to the Emergency Order "twenty-one percent of medical-surgical beds and thirty-two percent of intensive care unit beds are occupied by COVID-19 patients. With the large and growing influx of COVID-19 patients, there are fewer beds and resources available for people with non-COVID-19 conditions that require hospitalization."

36.     Froedtert was in the same predicament. To protect its patients and staff, Froedtert had no choice but to cease regular business operations and incur extra expenses in order to respond to the presence of SARS-CoV-2 at its properties.

37.     By September 30, 2020, Froedtert Hospital had dedicated resources to approximately 1,010 patients who tested positive for COVID-19. As of that same date, Froedtert Menomonee Falls Hospital had treated 304 COVID-19 patients and Froedtert West Bend Hospital had treated 111 COVID-19 patients. These numbers do not encompass the thousands of other people – delivery people, emergency medical technicians and ambulance staff, law enforcement, etc. – who physically visited the Froedtert facilities every day for some reason other than to receive treatment, many of whom may have been infected with SARS-CoV-2.

38. Each time an infected person entered one of Froedtert's properties, Froedtert experienced a new contamination event which qualified as "a case" or "any case" under the Policy's definition of "Disinfection Event."

39. The sudden influx of COVID-19 patients brought with it a change in treatment protocols. Because SARS-CoV-2 is a highly infectious communicable disease, Froedtert spent millions on personal protective equipment, safety equipment, employee and patient screening equipment, IT equipment supporting telehealth, waste disposal equipment, cleaning/sanitization supplies, and other equipment and supplies to prevent its spread among staff and patients. All providers in emergency rooms and urgent care facilities were instructed to wear eye protection, face masks, gowns, and gloves when examining any patient with shortness of breath or coughs.

40. Because SARS-CoV-2 spreads from person to person via surfaces of property in its facilities, the protective effort had to include both protection against direct transmission through the air and indirect transmission via surfaces. Froedtert was forced to modify its janitorial services, patient check in procedures, and even the layout of its emergency room in order to ensure frequent cleanings and social distancing. At the same time, Froedtert established COVID-19 screening and testing areas, expended resources to prepare for a coronavirus surge, rented a tent for staging, established testing facilities, and made other equipment, construction, and supplies purchases to respond to the pandemic.

41. As of June 2020, Froedtert incurred over $10 million in Disinfection Event Expenses.

42. In addition to moving and reallocating property, Froedtert also was forced to reorganized and reallocate its staff. Because SARS-CoV-2 is a highly infectious communicable disease, despite Froedtert's herculean efforts to prevent its spread, some staff did test positive or

exhibit symptoms of COVID-19. In this context, some hourly employees were reallocated from their typical job to assist with COVID-19 related tasks, such as patient screening, stocking of COVID-19 supplies, sanitizing, and other tasks. The labor costs at Froedtert Hospital alone exceeded $1,000,000.

43. In total, Froedtert spent over $18,000,000 on Disinfection Event Expenses in responding to the COVID-19 pandemic. These expenses are described in detail in Froedtert's Claim Summary, attached as **Exhibit B**, and incorporated herein.

**The Ironshore Policy Cover's Froedtert's Losses**

44. The Ironshore Policy provides coverage to Froedtert and its associated entities for Disinfection Event Expenses.

45. The SARS-CoV-2 outbreak, the COVID-19 pandemic, and the related flow of infected persons in and out of Froedert's properties fall squarely within the definition of "Disinfection Event."

46. The expenses Froedtert incurred during the COVID-19 pandemic were reasonable and necessary to clean and disinfect Froedtert's properties.

**No Policy Exclusion Precludes or Limits Coverage for Froedtert's Losses**

47. The Ironshore Policy does not contain any exclusions that apply to preclude or limit coverage for Froedtert's Disinfection Event Expenses.

48. Notwithstanding Ironshore's arguments to the contrary, the Professional Services Exclusion does not apply. Under this set of circumstances, the arrival of a person infected with SARS-CoV-2 created a Disinfection Event, regardless of whether a Froedtert medical professional treated that person.

49. Likewise, cleaning and disinfecting the hospital under these circumstances cannot be considered a "professional service" because the work does not require specialized knowledge, training, or skill.

50. Notwithstanding Ironshore's arguments to the contrary, the Internal Expenses Exclusion does not apply.

51. The Internal Expenses Exclusion operates to bar coverage for costs incurred by Froedtert without the prior written approval of Ironshore. (**Ex. A**, p. 39, § III, ¶ H).

52. The Policy also excuses the requirement of prior written approval where "notice is not possible under the circumstances because actions or measures … are immediately required to respond to a Disinfection Event due to an imminent threat to human health or the environment." (**Ex. A**, p. 41, § V. ¶ B).

53. In this case, Froedtert had to act swiftly to keep up with changing landscape of COVID-19 cleaning, disinfection, and prevention procedures. Froedtert did not have the time to submit a request to Ironshore in writing each time it needed a new order of personal protective gear, plastic dividers, or tents to set up operations outdoors.

**No Deductible Applies to Froedtert's Claim**

54. The deductible provision in the Ironshore Policy applies only to "Pollution Incidents." (See **Ex. A**, p. 42, § VI; § VI, ¶ D).

55. Under the definition of "Disinfection Event," "**Disinfection Event** [sic] do not include **Pollution Incidents**." (See **Ex. A**, p. 48, § IX, ¶ G).

56. Froedtert seeks coverage for Disinfection Event Expenses. Froedtert does not seek coverage for a "Pollution Incident."

57.     Froedtert was not obligated to satisfy a deductible in order to obtain coverage under the Ironshore Policy for Disinfection Event Expenses.

**Ironshore's Wrongful Refusal to Reimburse Froedtert**

58.     Ironshore has a duty to indemnify Froedtert for the money it spent on covered Disinfection Event Expenses.

59.     Froedtert gave timely notice of its claim pursuant to the terms of the Policy on April 8, 2020.

60.     Froedtert has complied with all other terms and conditions of the Ironshore Policy with respect to coverage for its Disinfection Event Expenses.

61.     Ironshore agreed to cover a mere $43,378.92 of Froedtert's Disinfection Event Expenses, but has wrongfully refused to compensate Froedtert for the remainder of its expenses, which total over $18,000,000.

62.     Ironshore has benefitted from this wrongful position, and it will continue to benefit, unless this court grants the relief Froedtert seeks.

## FIRST CAUSE OF ACTION: DECLARATORY RELIEF

63.     Froedtert repeats and realleges the allegations of paragraph 1-62 as though set forth fully herein.

64.     Froedtert seeks a declaration of the parties' rights and duties under the Policy pursuant to 28 U.S.C. § 2201.

65.     A justiciable controversy exists between Froedtert and Ironshore concerning Ironshore's duty to indemnify Froedtert for the Disinfection Event Expenses it incurred in order to respond to the COVID-19 pandemic.

66.     The controversy between Froedtert and Ironshore is ripe for review.

WHEREFORE, pursuant to 28 U.S.C. §§ 2201-02, Froedtert seeks a declaration from the court in its favor and against Ironshore that:

a. Ironshore is obligated to indemnify Froedtert's for its Disinfection Event Expenses;

b. No exclusion in the Ironshore Policy applies to bar or limit coverage for Froedtert's claim;

c. Froedtert has satisfied or is excused from satisfying, or Ironshore has waived or is estopped from enforcing, all conditions precedent under the Policy;

d. Ironshore must pay Froedtert prejudgment and post-judgment interest;

e. Ironshore must pay Froedtert for its court costs; and

f. Any other declaratory relief that would be useful to the resolution of the dispute between the parties.

### **SECOND CAUSE OF ACTION: BREACH OF CONTRACT**

67. Froedtert repeats and realleges the allegations in paragraphs 1-66 as though set forth fully herein.

68. The Ironshore Policy is a valid and enforceable contract.

69. Ironshore was paid a substantial premium in exchange for issuing the Ironshore Policy.

70. Froedtert has complied with all terms and/or conditions precedent to coverage under the Ironshore Policy.

71. Ironshore has breached the contract by refusing to indemnify Froedtert for its Disinfection Event Expenses as described herein.

72. Ironshore has breached the contract by failing to comply with its duty of good faith and fair dealing.

73. Ironshore's breach of its contractual duties has caused damages to Froedtert.

74. Froedtert's damages were foreseeable as a direct result of Ironshore's wrongful conduct, and are the type of damages contemplated when Ironshore issued the Policy, and should be awarded so that Froedtert is adequately compensated for Ironshore's wrongful conduct.

WHEREFORE, Froedtert seeks a ruling in its favor and against Ironshore on Count II that:

g. Ironshore should pay Froedtert all compensatory and consequential damages Froedtert suffered as a result of Ironshore's breach;

h. Ironshore should pay prejudgment and post-judgment interest on Froedtert's damages;

i. Ironshore should pay Froedert's attorneys' fees and costs for prosecuting this action;

j. Ironshore should pay Froedtert's court costs; and

k. For any other relief this court deems just and proper.

DATED: December 22, 2022

Respectfully Submitted,

REED SMITH LLP

By: _/s/ John B. Berringer_____
    John B. Berringer
    REED SMITH LLP
    599 Lexington Avenue
    22nd Floor
    New York, NY 10022
    (212) 521-5400
    jberringer@reedsmith.com

By: _/s/ John S. Vishneski III_____
    John S. Vishneski III
    Claire M. Whitehead
    REED SMITH LLP
    10 S. Wacker Dr.
    40th Floor

- 15 -

Chicago, IL 60606
(312) 207-1000
jvishneski@reedsmith.com
cmwhitehead@reedsmith.com

*Attorneys for Plaintiffs Froedtert Health, Inc., et al.*